Please all rise. Hear ye, hear ye, hear ye. This Honorable Elkhorn of the Second Judicial District will now come back in session for some Q&A. The floor is where we ask the shots to be presided over. Good morning. You can be seated. Your Honor, this case is about to be pursued. We have four teams. On behalf of the 112-9 Eastern State of Illinois plaintiff at the least, the Francisco Rojas-Ruiz dependent counsel. Attorney on behalf of the dependent counsel, Attorney Mr. Joel A. Brodsky. On behalf of the plaintiff at the least, Attorney Ms. Mary Beth Collins. Good morning. Mr. Brodsky, you can be seated. Good morning, Your Honors. May it please the Court, my name is Joel Brodsky and I represent the defendant, Appellant Mr. Rojas-Ruiz. I'd like to first start by looking at the issue regarding what I call the Brady violation regarding Detective Cavaletti. The number one reason for wrongful convictions are wrongfully or improperly obtained confessions. The history of wrongfully obtained confessions has led in this state to the abolishment of the death penalties, cost the taxpayers tens of millions of dollars, and has eroded public faith in the criminal justice system. Was there a confession here? Yes, there was a statement of confession, a videotaped confession that was introduced in evidence after a motion to suppress was denied. Mr. Brodsky, let me ask you this. I understand you're making a legitimate argument on the detective's background. These suits, was there ever any finding, specific finding of wrongdoing against the detective? I mean, like a jury trial? Judge, anybody announce that there was a finding of wrongdoing or violation of the law by the detective? No, not that I'm aware of. The cases against him were mostly settled. I do know that there were cases, for example, Jason Strong, where he obtained a confession and hereditative habeas corpus was issued by agreement with the state. I don't think there was a specific finding that he had wrongfully obtained that confession. However, it was his confession leading to the conviction, and it was vacated on the hereditative habeas corpus. Well, I understand. The reason I'm asking that is, what would be the basis, what is the test done for the admissibility? Because there could be all sorts of allegations. The court would go off into a, you know, basically a mission totally unrelated to the merits simply because allegations have been made, just as we wouldn't allow allegations against a defendant to come in that were unproven. We wouldn't allow allegations to come in. So I guess my concern is, in the absence of something specific to hang our hats on, how do we weigh this evidence? Correct. Well, I mean, first of all, we're talking about, to some extent, we're talking about two different things. We're talking about discovery and disclosure versus what's admissible at trial. So those are two obviously different things. The discovery could lead to admissible evidence, although it wasn't made. But second of all, I would think that the standard should be almost something along the same lines as prior bad acts. It has to be able to be proven. You don't need to, in order to get a prior bad act in against a defendant, you don't need to have a conviction or a finding, but you do have to be able to prove it, evidence that, more likely than not, the prior bad act occurred. But there's a statute for prior bad acts, isn't there? Yes. That is true. The Brady violation is sort of grafted onto whether or not the evidence would have been admissible. If a court would legitimately rule this evidence couldn't come in anyway, there wouldn't be a Brady violation. That is true. It has to be favorable to the defendant. It does not have to be... It has to be a Brady violation. It has to be favorable to the defendant. And to some extent, we're kind of a pig in a poke here because we really don't know what... Because these cases, a lot of them are settled, we really don't know what the internal findings were. We don't know whether there were any internal investigations by the police authorities that came up with findings. Now, what about this? When I say as a trial judge, I would probably go so far as to say this at times. If, in fact, there was some type of a disciplinary action sustained by the police department, then you might have something more to argue. But that didn't happen here, did it? Well, we don't know because it was never disclosed. And that, again, is our problem here is because we don't know a lot. And I don't know that the state ever even looked for this. What we do know is that Detective Capaletti was involved in the confessions that were in some of the more infamous cases that took place in this district. You know, Hobbs, Strong, just a number of infamous cases. That, in and of itself, leads one to believe that there's something out there, there's evidence out there of his wrongdoing. Well, if the case was that notorious like in Hobbs, then how can there be a Brady violation if you knew about it? Well, Hobbs was settled, so we don't know what the findings were. If any, regarding Detective Capaletti. And certainly, I was able to find out a lot of things by doing my own investigation. And why Mr. Grimes, the trial counsel, didn't do that type of investigation, I can't speak for him. What I am saying, though, and Brady is obviously, as you point out, not an easy burden to meet because you have to show prejudice. And we don't know, to some extent, what's out there other than his involvement in these infamous cases. So basically you're saying, look, we're hamstrung here, and we should have been able at least to get to the background of it, but we didn't. So that's part of your claim of evidence, right? Yes, because we do know he was involved in these infamous cases. There's more, I mean, to think that there's nothing involved, any type of investigation, any type of evidence, is just, you know, doesn't, is not credible. There obviously had to be something. The insurance companies, the insurance, somebody did an investigation finding out the facts. To say that there's nothing that should have been disclosed and nothing was, I think, is incredible. To, you know, so, to some extent, there should have been some disclosure of at least, you know, the more infamous issues. And then, as you said, discovery is where we go forward. Remember this, under the discovery motion, there was a discovery motion to state that the defendant, under the Supreme Court rule, has an obligation to come up with, independent of Brady, to come up with evidence favorable to the defendant. So it was exculpatory evidence, right? Exactly. I really spent all your time discussing this. I think we understand the argument. You might want to move on to the other points. The next thing is the argument, the next issue would be the verdict on Count 7 that was only signed by 11 jurors. Were the jurors polled, Mr. Brodsky? Yes. And every juror indicated that they were in agreement with the verdict, correct? That's what the transcript reflects, that's correct. Okay. But polling the jury is one, and usually it's the defendant that asked for the jury to be polled. Didn't the defendant ask for it in this case? Yes, and they did. Polling the jury is only one part of assuring that the verdict is in proper form and a proper judgment entered. Also, the judge has a duty to receive, review, and accept the verdict of the jurors. I think we have to concede. I mean, having tried many cases, it's highly unusual to get a verdict form that's missing a signature. It's missing the signature of the foreman. I concede that. But here's the issue. How then do we, what weight do we give to the polling in open court? Because the foreperson, who admittedly didn't sign the verdict form, acknowledged in open court that that was his verdict and the judge accepted it. So do we just ignore the foreperson's statement at the polling? Or how do we exalt the missing verdict form over his statement in open court? Well, I would think that, you know, the question that was asked of the jurors and I, was this, that here's what I think, was it now in open court? Right. And to some extent the answer is yes, because the unsigned form was his verdict then and not his verdict now. So he very well could have said, yes, that is my verdict. I didn't sign it. Didn't the foreperson indicate to the trial court judge that we had reached verdict on these charges? Yes. But you have to look at it in light of one other factor here. In the, just before the verdict came back, the jury sent out a question, if we cannot agree on all charges, what happens? The answer that was given was, if you have a question pertaining to the law, please put it in writing and submit it. The jury didn't get an answer to the very legitimate question, what if we can't reach a verdict on all forms? They were entitled to an answer to that question. So they were left then to speculate what happens. And they may very well have given that they weren't given an answer to a very legitimate and actually very good question. They may have speculated that we'll just turn them in as we are. Well, that's speculation. How would you have handled the issue? You have a missing jury returns to open court, they take their seats, the judge scans the verdict forms and finds out that there's a missing signature. Maybe he finds it out later. He missed it, obviously. The jury is called and the foreperson says it was and is the verdict. He could have as easily said no and it happened to me once where a juror said, you know, I got second thoughts, it's not now my verdict. But he didn't say that. So if he confirms in open court on the record there was and is now his verdict, how would we ignore that? On what basis would we ignore that? Well, I don't think you don't ignore it, but I do think that given the way the question was asked, You're saying to take it literally. Was this and is this now your verdict? Yeah, that's my verdict without my signature on it. Exactly. And given the fact that they were asked this question just before they came back with the verdict, what happens if we can't agree on all the counts and they weren't given an answer, it seems like that possibly that's a reason. Did you get the first impression, Mr. Grassley? I believe so. I could not find one. You don't have a case file, do you? I almost fell off my chair when I was looking through the record and I saw that only 11 were signed. I never heard of it or saw anything like this before. Other cases where they've done it, the jury hadn't been discharged and they were sent back to finish. But here now the jury's been discharged. No case, this is obviously first impression. My feeling on the matter is you have to look at the written document versus the potentially vague oral statement because the written document is obviously unequivocal. It is what it is. Let me ask you an example of a situation. You have the jury instructions read to the jury. They're all read. They're given to the jurors, you think, sent back. Jury reaches a verdict. When they come back, a couple of the jury instructions are missing. Are we going to go by the jury instructions given to the jury in open court or are we going to say, oh, those instructions weren't given because they're no longer in there? No, and I think they send the instructions back. I mean, certainly one can sit there and argue, well, they must not have gone back if they didn't come back out, right? Well, no, anything could have happened to them. They could have been destroyed. Somebody could have spilled coffee on them. Right, so in that situation you're suggesting we go by the oral instructions given in the courtroom. Why is this any different? Well, unless you would ask that if they came back like that, I suppose you could ask the jury what happened, but you wouldn't discover that until much later. Discover until a crack attorney like you figured it out, like you're preparing for it. Page by page by page. Right. Since we're asking a lot of pointed questions. But that's an interesting point, you know, oral versus. Well, that's what I want to ask you. You do a lot of litigation, not to cut you off. So what happens in a case, and this happens very frequently, and I imagine it's happened to you, where the judge makes an oral pronouncement, a decision on the record, particularly in family law divorce cases, and then counsel is then directed to prepare an order, and the order is inconsistent with the oral pronouncement. Isn't there a case law that says the judge's oral pronouncement controls? I think it's the opposite. I think the Supreme Court rule on that says it's the written order that controls. Are you sure about that? Because it has to be reduced to writing. So if you have a transcript of what the judge said and counsel prepared an erroneous order? Well, then you wouldn't have to come in and say, Judge, I want to correct the order. But if nobody does that, and let's do the final judgment, and 30 days have passed, there's no vacay, it's not final. But if somebody does challenge it, and you're challenging it here, you're asking the rhetorical question, what controls? The verdict form or what the foreperson said in open court, then you've got to make the call. But I think that in the case that you're describing, where an order is prepared improperly, that doesn't fit with the oral pronouncement, and it's final, then in the record of fidelity in public court, you would have to, by Supreme Court rule, go by what's in the written order, because the rule, I can't remember off the top of my head which rule it is, but I do know there's a rule that says that the orders to be reduced to writing, orders of the court, at least in civil cases, reduced to writing, and it's the written judgment or opinion of the order of the court that governs. So I think that, once again, that's kind of the Supreme Court indicating to us that it's the written document that should govern because it's unequivocal. Is there an overarching argument about the sufficiency of the evidence? Well, let me ask one question before we get off that topic. Judgment and sentence entered on counts 1, 2, and 21. Was there anything wrong with those verdict forms? What, 1, 2, and 21? I think it was 21, yeah. Yeah. Was there anything wrong with the verdict forms? No. They were all signed. They were all affirmed in open court and all that? Yes. The only problem would be is if you throw out the number 7, then you have an inconsistent verdict. In other words, because only 11 people signed it, then it's either not guilty or misdrawn. Then if it's not guilty because of that, it's not unanimous, then it's inconsistent. With what count? With count 1. Because that's the first incident that's in the indictment that says it's the first? Well, yeah. Let me take a quick look. But, yes, regarding that, it would certainly be inconsistent with counts 5 and 1. 5 was also found guilty of. But 7 signed it because 7 and 1 have the same first act. So you would have inconsistent verdicts, which then leads to the problem of, again, misdrawn. Very briefly, because I see I ran out of time, just to try to touch on these sort of issues, the one act, one crime issue, again, without counts 1 and count 21 merge, because they're both on the first distinct act, the state didn't allege in the indictment or information for indictment that there was one, two, three, and four distinct acts. It only referred to two distinct acts. So your client admitted to the officer, according to the officer's testimony, that he was wrestling with the victim and accidentally touched her over her clothing, correct? Yes. Why wouldn't that, if the jury believed that that wasn't accidental, form the basis of a conviction on 21 separate from penetration? Because the information or the indictment itself only talks about two distinct acts. So that would be a third distinct act, because they're talking, there also was evidence about him touching her underneath, you know, without the clothes on and penetrating without the clothes on. How do we, again, it's ambiguous to some degree, how do we know whether it's the first, because you say first distinct act in count 1, first distinct act in count 21, criminal sexual assault, aggravated criminal sexual abuse, correct? Which lesser would do the defense of the other? Right, but how do we know that's the same? How do we know the state's talking about the same thing? Because they could be delineating between different separate acts on the abuse side, separate from the penetration. Absolutely. And didn't they argue that in the closing? But in the closing argument, the state argued only one first distinct act and second distinct act. They didn't argue a third and fourth. They only argued two acts. And I quote from the closing argument. And I think that it is ambiguous. And the problem is where it's ambiguous, where the state doesn't do it, doesn't set it up, the ambiguity would go towards the defendant because, you know, they're trying to, I think the case, most of the cases they cite on 1 Act, 1 Crime, say that, you know, the state, the indictment has to be specific or the evidence has to be specific as to which act they're talking about. And where it's not specific, it's general. And the way it's written, it is that then 1 Act, they would merge. 1 Act, 1 Crime would merge. And then finally, as to the Sixth Amendment violation, the fact, and I, in this particular case, he was, my client was arrested on a warrant. The warrant should have just been taken to the county jail to go to the case. There was no reason. I mean, if he was arrested on a warrant, there was no reason to hold him at the police station and then have him interrogated. He had already had a finding of probable cause. The warrant was to deliver him to the court to do it. There had already been, you know, proceedings signing, probable cause proceedings, setting bond. He had, he was at that point facing the full force of the criminal justice system and to interrogate him without an attorney because he's entitled to an attorney under the Supreme Court rule. Didn't they read him his rights permanent? Yes. So are you saying anytime somebody is picked up on a warrant, they aren't allowed to be questioned? Well, you're saying it's a violation of Sixth Amendment right to counsel. Right. But the Supreme Court's case of Rothgary v. Gillespie totally changed the landscape. They specifically reject the argument that the right to counsel attaches upon the filing of a formal document or upon the arrest of the defendant. Right. So how do you, are you aware of that case? Oh, yeah. It's right for reference. But Rothgary also talks about, and I cite from that case, the fact that it still attaches. Let me see if I can just give you, I'm sorry, I'm so sorry. Take your time. There we go. There we go. Rothgary also says, Rothgary, R-O-T-H-G-E-R-Y, that says for the purposes of the right of counsel pegged commencement to the initiation of adversarial judicial criminal proceedings, whether by way of formal charge, preliminary hearing, indictment, information, or arraignment. So it says it's not mere formalism. And what we're talking about here is where there already had been a judicial finding of probable cause and an arrest warrant issued. I'm not saying anytime somebody's arrested they can't be questioned, obviously. But where there's been a warrant, a bond set, and a judicial finding, an ex parte judicial finding of probable cause, what Rothgary says and what I think the other cases say is that at that point, my client is faced with the full judicial prosecutorial force of the state and needs representation. And he can't waive that, even if he was properly given his Miranda, which he disputed. The Supreme Court rule doesn't allow for him to waive that right. That's Rule 401A. It doesn't allow him to waive the right to have an attorney present unless that's done in front of the court. And the court approves of that. So it's just not simply giving him his rights, even though he's right to an attorney at that point. When the Sixth Amendment attaches in Illinois, you have to comply with 401A in order to waive it. So I don't think- The argument is it attached and therefore couldn't have been waived. Unless they've taken him before a judge and he had waived that right. Exactly. Thank you very much. And hopefully see you for five years. We'll see you in rebuttal. Thank you so much. Ms. Burns, come on up. We'll give you a little extra time, too. How are you this morning? Thank you. I appreciate that. Good morning. My name is Mary Beth Burns, and I represent the people of the state of Illinois. We come here this morning to ask this court to affirm the judgment here. With this court's permission, I will try and respond to the defendant's arguments. And I think I can remember the order. I believe that his first discussion regarded the Brady-Gilio claim about Detective Capilouti. I think in response to some of your Honor's questions, part of the problem is, if you're looking at this in discovery, it would be difficult to determine what should be turned over. The defendant talks about cases that were fairly incendiary. But I think, as this court alluded, we have been unable to find an actual disposition. Our office did not have access to PACER, but I did check the Hobbs case on Westlaw Next. It does not show any history other than the federal supplement case. And so, again, because I don't have PACER, I don't know if it has continuing litigation. I don't know if they're in pretrial prep or if they did, in fact, settle. Don't the prosecutors know just about everything about every police officer that comes before them? I think it's possible that certainly ones who are in court regularly, which Detective Capilouti clearly was, they do know a great deal about them. However, I don't think that Brady or Giglio would impose a duty on a prosecutor to check with each police authority to determine if there have been complaints about a particular officer or detective. Well, how hard would that be? Was there a subpoena issued in this case? To tell you the truth, I don't know. Okay, so let's assume you're the trial judge and a subpoena is issued to you for the records of the police officer. Why couldn't the judge have got those, reviewed them in camera, and made the decision? What was wrong with at least looking into it? His point seems to be they never got the first base because they never had any kind of an examination. I guess with respect, I would have to say that what would be the harm isn't really the standard. What's the harm in the judge doing that, in fairness? Because I think when you look at a witness list and you have a significant number of officers and detectives, are we going to be limiting it to the detectives because they're likely the ones who are going to say something other than their response to a particular crime scene? Or are we going to say to every officer, what types of complaints are we going to turn over? If, in fact, we do a subpoena that would ask, has someone had a complaint that actually led to disciplinary action? If that were something that this court wanted to see, I think under the case law that would be discoverable and would be admissible. But my reading of the cases is that what would be admissible and hence discoverable would be fairly narrow. It would be things that led to- I would be inclined to agree with you, but at least his point seems to be they never got to their point right now. Well, I guess I would suggest also that I don't think they were asked for it. I think at some point, if this court believes that this is a standard that should be applicable, then I think part of that would have to put the burden on the defense once it gets a witness list or once it's going to do a motion to suppress such that it knows who did questioning at least to actually go to the court and say, please get information from superiors as to these detectives or these officers. Why would you, sua sponte, do this? There doesn't seem to be any rule or case law that says you are, correct? I'm sorry? There doesn't seem to be any rule or case that says you have to sua sponte, ask for a background. Certainly not. You're saying- I'm saying if this court believes that circuit court judges should be in a position to be doing it, they should be doing it based on a specific request from the defense. I don't think that anything in this case or any cases that I've read should impose a duty on circuit court judges to sua sponte to do it in every criminal case. Counsel alludes generally to the argument that it was in effect of assistance of counsel to not bring up the things that he brings up in his brief that's in his first argument. I would have to totally disagree. For starters, if you're going to make an actual ineffective assistance of counsel argument, you have to allege both prongs of Strickland. Neither prong is alleged. And to the extent that they would be taking the position that it was unreasonable performance not to ask for it, there isn't any case law historically that is provided for it. And so I don't know that counsel should be viewed as providing unreasonable performance for not doing something that has not been even suggested previously. As far as prejudice, the mere fact that what we come back to over and over again here is that what you have are a group of allegations. You do not have evidence of reprimand. You do not have evidence that Detective Capilouthi has ever done anything that generated a criminal conviction. And you don't have a judicial determination that he was in fact the cause of a false conviction. So there's no way in the world this could be a Strickland situation. To the extent that this court believes in the future, circuit court judges should be encouraged or ordered or have the duty imposed of doing this. This will be something for the future because nothing historically that I am aware of has imposed that type of duty on the circuit court judges. What about his argument on sufficiency of the evidence? I think his argument on sufficiency of the evidence is very weak. Even if you take out the confession, you have his testimony against a young girl who testified very clearly about the nature of the abuse versus a defendant who may or may not have signed Miranda warnings depending on what proceeding he was speaking at, who fled the jurisdiction the minute they lowered his bond and went to Mexico for five years, and who was involved in an illicit relationship which shows, if nothing else, that he's really comfortable with deceit. You mean the living with a girlfriend and having a wife? Yes. That's what you're talking about. Yes. So you're saying that goes with his credibility. Exactly. And so you had a young girl, well, young woman by the time the trial came because he was gone for five years, a young woman who testified with fairly significant clarity, and you have a defendant whose credibility is clearly suspect. And, again, the adultery to me simply means that he's someone who's comfortable with deceit. But if I'm a juror, the thing that's going to make me most uncomfortable is that he testified in two proceedings in the same prosecution. He testified in two different things as to whether or not he signed a Miranda form. So I think that, as a juror, you're looking very askance at this person. And the fleeing. Pardon me? And the fleeing. I consider the fleeing very significant. I also have to take something with a grain of salt, but sometimes I can say I would think this as a juror, and there are other times I think I'm not a juror, I'm a prosecutor. And so the fleeing was significant to me. I'm not entirely sure that a juror might be less moved by that if they're looking at somebody who's foreign and afraid. You know, so it's entirely possible that. Did the prosecution argue that this was consciousness of guilt? What did the prosecution argue about the alleged fleeing? I believe so.  I honestly don't remember a great deal of the argument. I do remember that my recollection is that the bulk of the argument had to do with the testimony about the actual events that occurred. That perhaps could lead to a discussion of the one act, one crime situation. Both counsel and our brief discuss the one particular quote. The defense takes that quote as meaning that they were the same act. However, what the prosecutor said below was he touched her, he penetrated her, he did both, or some words to that effect. The direct quotes in each of the briefs. My view of the testimony presented by the young lady in connection with the way this case was indicted. When she talks about the first incident, it was touching over her clothes. She was very surprised it had never occurred before. However, he then pulled down her pants, licked his fingers, and then penetrated her. Under CRESPO, where it is properly charged, those are two different acts. And in sexual assault litigation, closely connected acts, if charged separately and supported by the evidence, can support two convictions. The question is whether it's charged separately sufficiently with clarity. Because you have this language in both 1 and 21 that says the same as the first incident or whatever that language is. But it's the same language in both. Right. So we're talking about that same incident. Yes. Okay, so now we're talking about the same incident. Yes. And you would agree that touching over clothing, I'm sorry, touching, 21 is a lesser included of 1? Could be. Could be, though one of these facts is not. Okay, so basically the indictment can go both ways. You know, when I was reading it, to me it jumped off the page as being separate because it had CRESPO in my mind. I think, again, looking at the indictment in connection with the actual testimony, as the jurors would have been doing, there is a sufficient delineation between the two acts, the touching over the clothing, the licking of the fingers, and then penetrating, that I think the indictment and the evidence support two separate acts and two separate convictions. Along with your view of the argument. I'm sorry? Along with your view of the argument. Yes, absolutely. I'm sorry, are there any other issues that you would like discussed? I think that I would agree with the court's discussion of Rothgaring. I think the counsel's quotations are correct. I don't think, however, they accurately reflect the holding. The holding is the Sixth Amendment right to counsel does not attach until the defendant has, in fact, been brought forward in court and the whole panoply of the adversarial process is presented to him. Which is different than what the court earlier had said on Ballard. Yes. Ballard said that Rothgaring said no, correct? Yes. And again, Rothgaring, I think, gives some fairly legitimate underpinnings to its decision. And several Illinois cases that discuss Rothgaring talk about the same thing. And what it's sort of come down to is you're not in an adversarial situation until you actually know you're in an adversarial situation. Until you know that right now the state is, in fact, taking an adversarial position against you. For that reason, we're going to make sure you're counsel. In this situation, we're going to make sure that you're advised of the possibility of deportation. You're advised of the possibility that you have a right to call your counsel. All of these things occurred on July 12th, the day after the interrogation. Well, that's a very pointed question. I'm not trying to get too deep here. But couldn't a state constitution provide for greater protections than the federal constitution? It could. Could Illinois decide that it would attach upon the initiation of proceedings? It could if it so chose. I consider it unlikely because there were at least three cases following Rothgaring that accepted the reasoning that went below Rothgaring. Well, Ballard was an Illinois Supreme Court decision, was it not? I believe so. So why can't you argue Ballard's the law of the state of Illinois? Because I was— I think it was in theory you heard about exclusionary rules could be brought or other rules could be. Sure, sure. But typically in Illinois, unless the Illinois Supreme Court expresses the intent to go beyond the United States Supreme Court, traditionally Illinois does not. Did they block stuff, Dr.? Yeah, they did. Well, plus Ballard— I prefer consonants. We can rely on Ballard now because Ballard was looking at the prosecutorial awareness rule as outlined by the U.S. Supreme Court previously. So when the U.S. Supreme Court changes their mind, then I don't know that we can rely on the—the underpinnings of Ballard aren't there. Now, counsel does cite one of the three cases you referred to, Blue v. White, as supporting his position post-Rothgaring. Do you agree with that? No, I don't. My reading of all those cases was that they were sympathetic to Rothgaring and, again, because of Rothgaring's underlying principle, which is this is when you're on notice that, in fact, the state is taking an adversarial position against you. And that's where everything then attaches. Because your right to counsel under the Sixth Amendment is to give you all available protections against the state taking the adversarial position against you. So there's no point to a right to counsel under the Sixth Amendment unless and until you understand that there is an adversarial proceeding going on. So when you pick up on a warrant, do you not think that they get it, that there's an adversarial proceeding? Not necessarily. And, in truth, though there was apparently an ex parte hearing on the 10th, nothing could have presented a non-prosecute of those cases, of those charges, rather, if, based on an interview, the detective said, we believe him, we don't think that there's anything here. I see. And so, again, until he was actually before the court and knew that the charges were going forward, I don't believe that the Sixth Amendment right attached. Thank you. Anything further, gentlemen? Thank you. Thank you. Mr. Bronson. Your Honors, one thing that we really didn't discuss, but I just wanted to touch on, was the improper jury instruction that when the jury was instructed regarding the definition of sexual conduct, the jury instruction did not include sexual gratification as part of it. It only said sexual arousal. And sexual gratification was an element of counts 23 and 24. Was he sentenced on 23 and 24? No, he was not sentenced, but he was convicted. The prejudice comes because if the one- The State's not going to get a chance to respond. Okay, I'm sorry. We have, in your brief, I mean, it's- I just wanted to make sure I skipped it. I just wanted to point that out. I didn't, and I don't want to try to backdoor the State. I just didn't mention it when I'm on my direct- We'll take note of it. As far as the State's brief, regarding the Brady violation and what your Honor said about the in-camera inspection, I believe it is truly what would happen if it was subpoenaed. They said the State's position, though, that only disciplinary actions and such are to be disclosed, I think, is a bit disingenuous because we have a situation where you're saying, okay, the Department that has now hired Detective Capaletti in order to teach interrogation techniques is going to discipline him for doing improper interrogation techniques. So I don't think we can only restrict the disclosure to actual findings of disciplinary action by the Department. All this stuff you raise on this issue, I mean, it strikes me as being dehors the record. I mean- Yeah. So this appears to me to be something for one of two arguments, either unappeal here, ineffective assistance of counsel for not bringing it up, or a postconviction here. Well, I believe that Detective Capaletti in the petition, the motion to suppress and strike, when he was questioned, said that he's now teaching interrogation techniques. He's got a side job, for example, his side business is teaching interrogation techniques, and one of the parts that he teaches it to is the Waukegan Police Department. So it is in the record. It didn't come up at the trial. I'm talking about this stuff about all these other investigations, all these other, you know, the Strong case and the Hobbs case and all this.  Well, no, but I do put in the response that this court's allowed to take judicial notice of things that are both well-known within the jurisdiction or part of another court's proceeding. But the problem is, again, you were talking earlier in your first argument, and I didn't interrupt you, but, I mean, it seemed like a lot of speculation about talking about things that might be out there in relation to his conduct and what courts found and all that. We're sitting here, we don't know. And unless you're arguing, even if you argue ineffective assistance, I'll be honest with you, you're going to have a tough time with pledges because, again, we don't know. We don't know what's out there. We don't know what courts have said he did wrong. We don't know what his department has said he did wrong. These are all things that maybe are right for a post-conviction petition. Right, and that's why I note at the beginning of my brief that I didn't want to argue ineffective assistance in counsel because, as my Supreme Court has said, if I argue it here, then it's restituted caught in a collateral petition. So I specifically wanted to make sure, because in a post-conviction, I would have the ability to subpoena things and find out what was there or not. In any event, trial counsel did not subpoena the disciplinary records of Kevaluwe, right? No. The only thing that he did do is file a motion for discovery under Rule 412. Supreme Court Rule 412 says exculpatory information has to be disclosed out by the state, even without rating. It's part of the Supreme Court rule. So to say that all these things went on and there's nothing exempt for the state to – I don't even think the state would take that position. I mean, there were investigations involving these infamous cases, obviously, so there's stuff out there. If any of it was exculpatory, it should have been disclosed. Nothing was disclosed. So that's, I think, our problem here. And on the sufficiency of the evidence point, without the confession, it's really a he said, she said case. Really? Without the confession? It's just – You had her testifying pretty explicitly as to what occurred, correct? Right. And as Ms. Burns said, you had him fleeing the jurisdiction. Yes. You had him living with a woman while married to another woman. Yes. I mean, how do we invade the province of the jury when they heard all of this evidence? Well, the point about him – I mean, that confession is – I mean, it's not exactly him laying down and saying, Mayakopa, I did all of this. It's – he really tried to explain things away, didn't he? Yeah, as typically defendants try to do. Right. But, I mean, so I guess, you know, being a former prosecutor, you look at a confession as, like, you know, tied up with a buffalo confession. That's not what this was here. No. I mean, he even said in his confession when he denied – Detective Capaletti, who destroyed his notes of the original interview, by the way, then says – takes him into the taped interview, and he – there he says he denied penetration, where Detective Capaletti said in the original interview where the notes had been destroyed, he admitted penetration. So it's not tied up in a bow. However, if you take that out, you have to remember that the accusation of abuse came after my client broke up with his girlfriend and went back to the wife, and then the girlfriend – Correct. All of a sudden came and said – so that's her motive to fabricate. Correct. And jury heard all that. Right. The jury did, but they also heard the confession. So I'm saying that with the – without the confession, they may have given more weight to the motive to fabricate. But, you know, when you have the confession in, it clearly – I think it makes it a much closer case. I'm not saying that the jury doesn't have a right, obviously, to decide the facts, but clearly I think it makes it a much, much closer case. Because they could have said, well, you know, the hell I have no jury, and, you know, who knows what she could have manipulated her daughter to do for vengeance' sake. I mean, obviously the jury was out seven and a half hours. They didn't think it was a slam dunk. So in any event – Do you want to wrap up? I think we're – I think I'd wrap up. You know, obviously we didn't raise ineffective assistance except as to a plain error. In reality, I think that my client did not – with all these factors mixed in and all these issues with jury instructions, improper jury instructions, it wasn't a verdict, which my client didn't receive a fair trial. And we ask this court to remand for a new trial. Thank you. Thank you. Thank you, folks, so much for your arguments this morning. We will render a decision in due course, and court is in recess. Thank you.